# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:10-cv-636-RJC-DLH

| | | |
|---|---|---|
| **SEAN P. SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **ORDER** |
| **PETER S. GILCHRIST, III,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary

Judgment. (Doc. No. 17).

## I.      BACKGROUND

A.      <u>Procedural Background</u>

Defendant filed his Motion for Summary Judgment, (Doc. No. 17), on June 25, 2012.

Although Defendant asserted qualified immunity in his Answer, (Doc. No. 8 at 13), he did not

argue it in his Motion for Summary Judgment. <u>See</u> (Doc. No. 18). Given the Fourth Circuit's

guidance in <u>McVey v. Stacy</u> that courts should give qualified immunity a "hard look,"

particularly at the dispositive stage, the Court raised the issue of qualified immunity sua sponte.[1]

<u>See</u> 157 F.3d 271, 275 (4th Cir. 1998) (noting that it is "incumbent on the courts to review the

_____

[1] <u>See</u> <u>U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n,</u> 873 F.2d 731, 735 (4th Cir. 1989) (recognizing that courts may raise summary judgment sua sponte). It is well-settled that qualified immunity is an affirmative defense, and that "the burden of pleading it rests with the defendant." <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980). Here, Defendant pled qualified immunity in his Answer. While the Fourth Circuit has held that defendants may waive their qualified immunity defense when they raise it in their Answer but never explain the legal or factual basis therefor, <u>see</u> <u>Sales v. Grant</u>, 224 F.3d 293, 296 (4th Cir. 2000), nothing would bar Defendant from arguing the defense for the first time at trial. <u>See</u> <u>Buffington v. Baltimore Cnty.</u>, 913 F.2d 113, 121 (4th Cir. 1990); <u>Noel v. Artson</u>, 297 F. App'x 216, 218 (4th Cir. 2008) (unpublished).

immunity defense critically at an early stage of the proceedings"). On August 21, 2012, the Court ordered supplemental briefing on the issue of qualified immunity. See (Doc. No. 22). The parties have provided such briefing, see (Doc. Nos. 25; 26; 27), and Defendant's Motion for Summary Judgment, (Doc. No. 17), is now ripe for adjudication.

B.    Factual Background[2]

Defendant Peter S. Gilchrist, III ("Defendant" or "Gilchrist") was the elected District Attorney for Mecklenburg County for thirty-six years. (Doc. No. 1: Complaint at ¶ 10). Plaintiff Sean P. Smith ("Plaintiff" or "Smith") worked as an Assistant District Attorney for the Mecklenburg County District Attorney's Office from 2004 through July 2010. (Id. at ¶¶ 13-14).

In mid-February 2010, Plaintiff met with Defendant in his office to inform him that Plaintiff intended to declare his candidacy for Mecklenburg County District Court Judge. (Id. at ¶ 16; Doc. No. 18-1: Gilchrist Depo. at 62). Defendant advised Plaintiff that, should he run for judge, Defendant would require Plaintiff to resign from his position as an Assistant District Attorney or take an unpaid leave of absence during the period from his declaration as a candidate to the November 2, 2010 election. (Doc. No. 1 at ¶ 18; Doc. No. 18-1 at 60). Defendant testified that he "thought it [would be] disruptive to the office," and explained that there had previously been "an episode with an assistant public defender who had run for district court judgeship and created some problems." (Doc. No. 18-1 at 60-61). Plaintiff states, and Defendant agrees, that this would have effectively precluded Plaintiff from running for judge. (Doc. No. 1 at ¶ 19; Doc. No. 18-1 at 60-61).

---

[2] When ruling on a summary judgment motion, the Court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Plaintiff subsequently found North Carolina General Statute § 126-13(b), which he interpreted as allowing him to run for public office without leaving his current employment as an Assistant District Attorney. (Doc. No. 1 at ¶¶ 20-23). Plaintiff brought a copy of the statute to Assistant District Attorney Steve Ward ("Ward") to discuss the situation. (Id.). Plaintiff and Ward discussed the law and Defendant's requirement that Plaintiff take a leave of absence to run for public office. (Id. at ¶ 24). Plaintiff left Ward with a copy of the statute. (Id. at ¶ 25).

On February 23, 2010, Defendant advised Plaintiff that he could run for District Court Judge without resigning or taking a leave of absence. (Id. at ¶¶ 26-27). Defendant discussed the law precluding campaign activities during work hours, which Plaintiff acknowledged. (Id. at ¶ 28). That same day, Defendant, through Deputy District Attorney Bart Menser ("Menser"), sent all members of the District Attorney's Office a memo covering this law and discussing the appropriate political activities of State employees. (Id. at ¶ 29; Doc. No. 1-1: 2/23/10 Memo). On February 24, 2010, Plaintiff submitted his candidate packet for District Court Judge. (Doc. No. 1 at ¶ 31).

On May 25, 2010, Plaintiff paid $60 to attend the Safety and Health Council of North Carolina's four-hour Defensive Driving Course in Charlotte. (Id. at ¶¶ 35, 37). Plaintiff states that he did so in furtherance of his candidacy as District Court Judge and to inform himself about various programs relating to District Court cases. (Id. at ¶ 36). Plaintiff was "disappointed" by what he observed in the class because, among other things, active participation in the class was not required of the students, no test was administered, and the teacher purportedly offered incorrect information regarding Prayer for Judgment Continued ("PJC") and traffic law. (Id. at ¶¶ 39-43).

In early July 2010, Plaintiff agreed to be interviewed by Morgan Fogarty ("Fogarty") of

FOX Charlotte regarding the driving school, the process defendants follow in attending the driving school, and its relationship to Charlotte-Mecklenburg's public schools. (Id. at ¶¶ 49-50). Early in the week of July 5, 2010, Plaintiff's supervisor granted his request for a half-day vacation for the afternoon of Friday July 9, 2010.[3] (Id. at ¶¶ 51-52). On July 9, 2010, Plaintiff met with Fogarty and gave an on-camera interview about the driving course. (Id. at ¶¶ 53-54). Plaintiff discussed, among other things, how attendance at the driving school precluded the possibility that a fine would be assessed by the court system. (Id. at ¶ 58). Plaintiff also stated that the North Carolina Constitution requires that criminal fines and traffic fines taken in by the courts go to fund the public schools, and noted that money from a defendant attending the driving school was essentially diverted away from the public school system at a time when more than six hundred teachers had been laid off. (Id. at ¶¶ 60-61).

On Wednesday July 14, 2010, Defendant telephoned Plaintiff to ask if he had given an interview to Fogarty of FOX News and Plaintiff advised that he had. (Id. at ¶¶ 62-64). Upon Defendant's request, Plaintiff went to Defendant's office where he met with Defendant and Deputy Menser. (Id. at ¶¶ 63-67). Menser testified that during the meeting, Plaintiff explained that "he had issues with the driving school and with the fact that the District Attorney's Office was involved in recommending that people go to the driving school, and that he . . . had decided to do the interview." (Doc. No. 18-2: Menser Depo. at 14). According to Menser, Plaintiff "disagreed with the D.A.'s office policy to be part of the arrangement that allowed individuals to go to the driving school and receive a PJC. He objected to the school, and he objected to [the District Attorney's Office's] involvement in [it]." (Id. at 48). Menser explained that Plaintiff's

---

[3] There is no indication in the record that Plaintiff advised his supervisor that the purpose of his half-day vacation request was to give a television interview regarding the driving program.

criticism was problematic because they "had a lot of drivers go through that school each year, and it was an important way for [them] to offer people an alternative to coming to court, and helped [their] dockets considerably." (Id. at 49). The school allowed the District Attorney's Office "to be able to handle the volume of cases [they] deal with in District Court." (Id.). According to Defendant, the program had over 20,000 participants in its first year. (Doc. No. 18-1: Gilchrist Depo. at 49). "It had a substantial impact on the courts, which was important. It reduced the number of cases that [the District Attorney's Office was] having to . . . deal with." (Id.). Gilchrist added that "as the elected district attorney, the administration of justice in Mecklenburg County is very important" and the availability of the defensive driving course "removed a lot of minor cases from the court system, which gave [the District Attorney's Office] time to spend on some other things that were, in my opinion, much more important." (Id. at 55).

Plaintiff states that Defendant and Menser expressed dismay that he had not consulted them prior to giving the interview. (Doc. No. 1 at ¶ 69). Plaintiff responded that the interview was part of his campaign for District Court Judge. (Id. at ¶ 70). Defendant stated: "I had an expectation that folks would bring to my attention problems so we could take a look at [them]." (Doc. No. 18-1 at 77). Defendant expected Assistant District Attorneys to approach him and say "'We're doing something that I think we need to . . . take a look at or I don't agree with.' And we would–I would try to bring together the appropriate folks to have a look at something and decide how do we improve, how do we change, what needs to be changed." (Id.).

According to Defendant,[4] when "Menser asked Plaintiff if he had considered talking to him and Defendant prior to giving the interview[,] Plaintiff stated that he had considered it but

---

[4] Defendant's version of events does not directly contradict Plaintiff's version of events. Defendant provides additional factual detail, which Plaintiff neither addresses nor denies.

didn't think they would like it, so he decided against it." (Doc. No. 18 at 2). Indeed, Defendant was not pleased that Plaintiff had given an interview criticizing the defensive driving course because he "felt that [Plaintiff] had developed some issues without substance for publicity purposes that were detrimental to a program that was beneficial to the court and to the District Attorney's Office." (Doc. No. 18-1 at 85).

Defendant was also concerned that Plaintiff did not give him a heads up after the interview. (Id.). "Menser asked Plaintiff if he considered telling them afterward . . . Plaintiff stated that he considered it but decided against it." (Doc. No. 18 at 2). Plaintiff states that as he rose to leave Defendant's office, "Deputy Menser asked him if there were 'any other office policies' with which he disagreed. The Plaintiff declined to provide his opinions about District Attorney's Office policies." (Doc. No. 20 at 4); see also (Doc. No. 1 at ¶ 72). Defendant found this to be insubordinate because he "expected to be able to ask any assistant district attorney who worked for [him] a question and get a full and complete answer from him." (Doc. No. 18-1 at 82). When asked whether there was a written policy to this effect, Defendant testified as follows: "I had no written policy that I expected candid and truthful answers and complete answers from members of my staff when asked a question, but I think that was implicit in employment." (Id.). Menser testified similarly that:

> One of the things we stress with the people in the office is even when you're over in court and you have a run-in with someone where you think your Supervisor may hear about it, you routinely let your Supervisor know, "Let me tell you what happened in court today. I think you may get a phone call about this, and I'd like for you to be prepared so that you can respond, or come back to me and ask me specific questions."

(Doc. No. 18-2 at 27). Menser described Plaintiff's demeanor during their meeting as "argumentative," (Doc. No. 18-2 at 21), "combative," (id. at 23), "flippant," (id. at 25), "deliberately [] defiant," (id. at 52), and "[c]ertainly disrespectful, antagonistic, unwilling to

have a discussion," (id. at 26), and stated that "it was as though [Plaintiff] wanted to get fired," (id. at 16). After Plaintiff left Defendant's office, Defendant spoke with Menser. (Doc. No. 18-1 at 66). Gilchrist said to Menser, "I feel like we've got a drummed-up complaint to generate publicity. . . . I don't know what else is on his mind that [] he won't tell me." (Id.).

Fogarty subsequently asked Gilchrist for an interview or comment. Menser testified:

> It -- it was entirely logical, and [Smith] should have been able to see that the media, that is, the reporter that he had talked with, would call Peter Gilchrist and say, "Mr. Gilchrist, what is your response to one of your Assistant D.A.s saying that the driving school that you have worked closely with for years is a bad idea and shouldn't be operated?"

(Doc. No. 18-2 at 22). Gilchrist testified that Fogarty, "was calling me on the phone and sending me e-mails. I think at one time she had her station manager call me." (Doc. No. 18-1 at 72).

On the evening of July 14, 2010, Fogarty informed Plaintiff that she had given Defendant a brief summary of what Plaintiff discussed with her during the interview. (Doc. No. 1 at ¶¶ 75-76). The following day, upon Defendant's request, Plaintiff met with Defendant and Menser. (Id. at ¶ 79-80). Defendant informed Plaintiff that he was an at-will employee and his employment as an Assistant District Attorney was terminated effective immediately. (Id. at ¶ 81). According to Menser, Plaintiff was fired because of his "history in the office, his behavior during this meeting, his refusal to discuss what other policies he disagreed with[,] led [Menser] to the conclusion that we couldn't trust him to follow the policies of the office, and, frankly, that it was kind of the last straw." (Doc. No. 18-2 at 29). Menser explained that there were at least nine prior incidents in which Plaintiff acted inappropriately but because he was intelligent and competent, Plaintiff had not been terminated. (Doc. No. 18-2 at 17, 60-94). Gilchrist testified that when Plaintiff "wouldn't tell [him] what his complaints with the office were, that troubled [him]," and was "the straw that broke the camel's back." (Doc. No. 18-1 at 68).

7

Plaintiff maintains that Defendant terminated his employment because of his public comments about the driving school. (Doc. No. 1 at ¶ 87). Plaintiff alleges that he suffered lost wages, lost benefits, mental suffering and emotional distress as a result of Defendant's actions. (Id. at ¶ 88-89). Plaintiff "seeks a declaration that the Defendant's actions were unconstitutional and seeks compensatory and punitive damages, attorneys' fees, and reimbursement for the costs associated with this action." (Doc. No. 20 at 5). Defendant contends that Plaintiff was terminated for his insubordinate behavior during the July 14, 2010 meeting. (Doc. No. 18 at 5-6). For the reasons that follow, the Court finds that, even assuming Plaintiff's news interview was protected speech and that his employment was terminated because he gave the interview, Defendant is protected by the doctrine of qualified immunity and therefore Plaintiff's Complaint must be dismissed.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The

nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.   DISCUSSION

Plaintiff filed his Complaint pursuant to 42 U.S.C. § 1983, alleging that Gilchrist fired him for speaking to FOX Charlotte as a private citizen about a matter of public concern. Plaintiff alleges that Gilchrist violated his rights to freedom of speech found in the First Amendment to the United States Constitution and in Article 1, Section 14 of the North Carolina Constitution.

### A.   First Amendment Retaliation Claim

The First Amendment protects not only the affirmative right to speak, but also the "right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). However, "[w]hile government employees do not lose their constitutional rights at work, the Supreme Court has repeatedly held that the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (citing City of San Diego v. Roe, 543 U.S. 77, 80 (2004); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) ("[T]he State has

interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."); Urofsky v. Gilmore, 216 F.3d 401, 406 ("[T]he state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole.")).

In Pickering v. Board of Education, 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983), the Supreme Court analyzed the competing interests at play between a public employee, "as a citizen, in commenting upon matters of public concern" and the government, "as an employer, in promoting the efficiency of the public services it performs through its employees." Connick, 461 U.S. at 142 (quoting Pickering, 391 U.S. at 568). In McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998), the Fourth Circuit explained that Pickering and Connick balance those competing interests in the context of a claim for retaliation by requiring the court to determine:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's [adverse employment] decision.

157 F.3d at 277-78 (the *"McVey* test"); see also Lee v. York Cnty. Sch. Div., 484 F.3d 687, 693-94 (4th Cir. 2007).

At this summary judgment stage, although there is conflicting evidence regarding the motivation for Plaintiff's termination, the Court must assume the news interview in which Defendant criticized the defensive driving program was a substantial factor in the firing decision. Anderson, 477 U.S. at 255 (In ruling on a motion for summary judgment, "[t]he evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The Court will also assume, *arguendo*, that this was a violation of Plaintiff's First Amendment rights. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

B. Qualified Immunity

Qualified immunity from § 1983 claims "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. As the Supreme Court recently explained, "[a]t common law, those who carried out the work of government enjoyed various protections from liability when doing so, in order to allow them to serve the government without undue fear of personal exposure," and the Court's "decisions have looked to these common law protections in affording either absolute or qualified immunity to individuals sued under § 1983." Filarsky v. Delia, 132 S. Ct. 1657, 1660 (2012).

Claims to qualified immunity present a two-pronged inquiry. The governmental official will be granted immunity unless (1) "the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right," and (2) "the right at issue was 'clearly established' at the time of [the] alleged misconduct." Pearson, 555 U.S. at 232. The Supreme Court clarified in Pearson that it is within the Court's discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 236 ("On

reconsidering the procedure required in Saucier [v. Katz, 533 U.S. 194 (2001)], we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."); see also Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010) (affirming grant of summary judgment as to all claims asserted under 42 U.S.C. § 1983 on qualified immunity grounds); Hunsberger v. Wood, 570 F.3d 546, 552 (4th Cir. 2009) (same).

The Fourth Circuit has emphasized "the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial." Wilson v. Kittoe, 337 F.3d 392, 397 (4th Cir. 2003); see also McVey v. Stacy, 157 F.3d at 275 ("[W]hen a district court declines to give a qualified immunity defense at the dismissal stage of litigation a hard look, it risks unwittingly the forfeiture of some protections afforded by that defense."). "Qualified immunity includes 'an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal [immunity] question.'" McVey, 157 F.3d at 275 (quoting Behrens v. Pelletier, 516 U.S. 299, 306 (1996)).

The Court will assume that Plaintiff satisfied the first prong of the qualified immunity test by demonstrating that his First Amendment rights were violated. Under the second prong of the qualified immunity test, this Court must consider whether the right that is assumed to have been violated was clearly established at the time of the alleged misconduct, such that a reasonable government official would have known of the right. McVey, 157 F.3d at 276. The question under this prong is an objective one, "dependent not on the subjective beliefs of the particular [official], but instead on what an objectively reasonable [official] would have understood in those circumstances." Bailey v. Kennedy, 349 F. 3d 731, 741 (4th Cir. 2003). In considering whether the right was clearly established, the right must be framed at the appropriate

level of specificity.[5]  "For a right to have been clearly established, 'the contours of the right must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional.'"  Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) (quoting Swanson v. Powers, 937 F.2d 965, 969 (4th Cir. 1991)).  "In determining whether a right was clearly established at the time of the claimed violation, courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, [the] court of appeals, and the highest court of the state in which the case arose."  Id. (quotation omitted).  The right alleged here is the right of an Assistant District Attorney running for political office to pay money, attend a driving class, and criticize the value of the class as a matter of public concern, where that class is a program directly related to the efficient operation of the District Attorney's Office, without being terminated by the District Attorney.

The Court next considers "whether a reasonable person in the official's position would have known that his conduct would violate that right."  Edwards, 178 F.3d at 251 (citing Anderson, 483 U.S. at 639).  Here, the Court does "not impose on the official a duty to sort out conflicting decisions or to resolve subtle or open issues. 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'"  McVey, 157 F.3d at 277 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

To determine whether Plaintiff's right was clearly established at the time of his

---

[5] In Edwards v. City of Goldsboro, the Fourth Circuit explained that the right at issue, stated "at the appropriate level of particularity," was "the right of a police officer to express his personal views on a matter of public concern in an off-duty employment setting without incurring discipline from his employer or being threatened with termination motivated solely by the police chief's personal and political zeal to oppose the lawful possession of firearms and because of the police chief's desire to promote his own personal political agenda."  178 F.3d 231, 251 (4th Cir. 1999).

termination, the Court must balance Plaintiff's interest in the speech at issue against the District Attorney's interest in the efficient functioning of his office. See id. at 278; see also Rankin v. McPherson, 483 U.S. 378, 388-91 (1987). Defendant argues that a reasonable official could not have known what the outcome of this Court's First Amendment analysis would be. (Doc. No. 25 at 8). He explains that "[P]laintiff's interview criticized the policies of the office for which he worked, potentially disrupting its 'operation and mission,' and triggered the Pickering balancing test to determine if it was constitutionally protected." (Id.). "Because the speech requires balancing to resolve whether it is protected," Defendant argues, "this Court should not consider plaintiff's right 'clearly established.'" (Id.).

In support of his argument, Defendant cites Mills v. Steger, 64 F. App'x 864 (4th Cir. 2003), in which the Fourth Circuit affirmed dismissal of a First Amendment claim on qualified immunity grounds. In Mills, a university employee working as the manager of a public radio station made negative public statements about the cancellation of an Opera program and was subsequently reassigned to a different radio station. 64 F. App'x at 867-68. The court found that the plaintiff spoke on a matter of public concern, was deprived of a valuable benefit, and demonstrated a link between the speech and the deprivation. Id. at 871-73. The court further found that the plaintiff showed that his interest in the speech outweighed the university's interest in efficiency. Id. Despite finding that the plaintiff's First Amendment rights were violated, the court held that the defendants were protected by qualified immunity because the court could not "say that a reasonable official should have known what the outcome of our First Amendment analysis would be," given the need for balancing to resolve the issue. Id. at 874.

The Mills court stressed the complexity involved in balancing a plaintiff's free speech rights against an employer organization's interest in efficient functioning. Factors to be

balanced include whether the speech: impairs discipline or harmony in the organization; hinders the employee in the performance of his duties; interferes with the operation of the organization; or undermines the organization's mission.  Id. at 872 (citing McVey, 157  F.3d at 278; Rankin, 483 U.S. at 388-91).  Next, the court considered the speech visavis the employee's role: whether the speech was made in public; whether it conflicted with official duties; and whether it used authority derived from the employee's role at work.  Id.  Finally, the court noted that some agencies like police and fire departments, as contrasted to the University defendant in the Mills case, provide essential services and depend on good working relationships within the department that warrant placing a premium on the government interest.  Id.

Certainly a District Attorney's office is more like a police or fire department than it is a university in providing public health and safety services.  Many of the other Mills factors also favor Defendant.  See Mills, 64 F. App'x at 872.  In any event, the First Amendment analytical process required here suggests a balancing complexity that thwarts a finding of a clearly established right.

Nonetheless, Plaintiff contends that Defendant's argument is flawed because, "[a]s he himself has admitted, Plaintiff did not criticize any District Attorney Office policy in his FOX interview.  He criticized a class offered by a local nonprofit organization.  He didn't work for that organization, and Defendant was not responsible for that organization's operation and mission."  (Doc. No. 26 at 14).  According to Plaintiff, "Defendant has demonstrated, by his own words, that he considered Plaintiff's free speech rights in the FOX interview to be 'clearly established' and that he knew what the outcome of the court's First Amendment analysis would be."  (Id. at 14-15).  "With respect to statements made in the FOX interview," Plaintiff concludes, "Defendant has essentially conceded the second prong of the qualified immunity

analysis with his own admissions." (Id. at 15).  As evidence of this alleged concession, Plaintiff

directs the Court to Defendant's deposition, in which he testified as follows:

> Q.      You would agree that Sean Smith's comments to the media, as you
>         understand them to have been made, would be protected by his First
>         Amendment right to free speech; correct?
> A.      Yes.

(Doc. No. 18-1: Gilchrist Depo. at 19).  However, the right is not unqualified.  "Simply because

an employer knows his employees have the right to [make certain public statements] does not

create the inference that an objectively reasonable elected official in his position would fully

understand the contours of his employees' rights.  Nor does it mean that he should understand

the complexity of the legal questions involved in this case."  Bland v. Roberts, 857 F. Supp. 2d

599, 608 (E.D. Va. 2012).  Plaintiff's counsel's questioning of Defendant "barely touches the

convoluted arena of the law in which the [Defendant] and his discharged employee[] have

opposed one another."  Bland, 857 F. Supp. 2d at 608.

In Bland v. Roberts, the Eastern District of Virginia addressed a factual scenario similar

to the one at issue here.  In Bland, the plaintiffs argued that the defendant sheriff was not entitled

to qualified immunity because he testified in his deposition that he understood firing employees

for their speech or political affiliations was not a right he possessed.  857 F. Supp. 2d at 607.

The testimony was as follows:

> Q.      So you believe that you have the right to terminate them for any reason,
>         including political opposition to you?
> A.      No.
> Q.      You don't believe that?
> A.      No, I don't believe that I have the right to—I know I have the right to
>         terminate their employment at will, but I'd have to have a cause for at will.
> Q.      Okay. But in any event, it's your understanding that you don't have the
>         right to end a nonsupervisory employee's employment at will for political
>         opposition to you? . . .
> A.      The answer to that would be no.

Id. at 607-08. In finding that the defendant sheriff had not waived his immunity defense, the district court reasoned that "[w]hen the Sheriff answered 'no' to the question of whether he could fire an employee for political opposition, what his answer actually shows is that he fails to understand the complexity of this area of the law because there are certain instances where a government employer can demand the loyalty of his employees." Id. at 608.

The same complexity concerns and loyalty demands are present here. A District Attorney can terminate an employee for speech which hinders the efficient operation of the government agency, without violating that employee's First Amendment rights. See, e.g., Connick, 461 U.S. 138; Garcetti v. Ceballos, 126 S. Ct. 1951 (2006). Further, a public employee who has a "public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence enjoys substantially less First Amendment protection than does a lower level employee." McVey, 157 F.3d at 278.

Here, Plaintiff worked as an Assistant District Attorney for six years and could not, merely by introducing himself as a candidate for judge, sever his ties to the District Attorney's Office. Gilchrist stated, and Plaintiff did not dispute, that the District Attorney's Office allowed the Assistant District Attorneys substantial freedom in communicating with the press. (Doc. No. 18 at 5). According to Gilchrist, the driving school has a significant impact on the efficient operation of the District Attorney's office because the existence of the program enables the District Attorney's Office to focus on more pressing cases. (Doc. No. 18-1: Gilchrist Depo. at 49, 55). Although Plaintiff contends the driving school is completely separate from the District Attorney's Office, and thus his criticism of it could not impugn the efficient operation of the Office, Defendant presented significant, uncontradicted evidence linking the District Attorney's Office to the driving school. Menser testified that when he and Gilchrist met with Plaintiff to

discuss the news interview, Plaintiff stated that "he had issues with the driving school and with the fact that the District Attorney's Office was involved in recommending that people go to the driving school." (Doc. No. 18-2: Menser Depo. at 14). According to Menser, Plaintiff "disagreed with the D.A.'s office policy to be part of the arrangement that allowed individuals to go to the driving school and receive a PJC. He objected to the school, and he objected to [the District Attorney's Office's] involvement in [it]." (Id. at 48). Menser explained that Plaintiff's criticism was problematic because they "had a lot of drivers go through that school each year, and it was an important way for [them] to offer people an alternative to coming to court, and helped [their] dockets considerably." (Id. at 49). The school allowed the District Attorney's Office "to be able to handle the volume of cases [they] deal with in District Court." (Id.). Gilchrist further explained that the program had over 20,000 participants in its first year. (Doc. No. 18-1: Gilchrist Depo. at 49). "It had a substantial impact on the courts . . . . It reduced the number of cases that [the District Attorney's Office was] having to . . . deal with." (Id.). Gilchrist added that the availability of the defensive driving course "removed a lot of minor cases from the court system, which gave [the District Attorney's Office] time to spend on some other things that were, in my opinion, much more important." (Id. at 55).

The Fourth Circuit has made clear that, "particularly in First Amendment cases, where a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, 'only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected.'" McVey, 157 F.3d at 277 (quoting DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995)); see also Mills, 64 F. App'x at 874 ("Although plaintiffs have prevailed in some First Amendment retaliation cases, see Cromer [v. Brown, 88 F.3d 1315, 1330-31], most do not, simply because the individualized

assessment required by the <u>Pickering</u> balancing test means we can rarely say that the law was clearly established and that reasonable officials would have been aware of the law.").

Here, as with most cases, the Court cannot say that Gilchrist should have known that terminating Plaintiff would be a violation of his First Amendment rights.  Given the "fine line drawing" required to determine whether someone in Plaintiff's position is entitled to First Amendment protection under the <u>Pickering</u> test, the Court finds that the law with respect to Plaintiff's First Amendment rights was not clearly established such that an objectively reasonable person would know it.  <u>Mills</u>, 64 F. App'x at 874.  This Court cannot find that Gilchrist "transgressed bright lines."  <u>Maciariello</u>, 973 F.2d at 298.

Even if Gilchrist fired Plaintiff for giving the news interview, there are a number of cases in which courts have held that a government employer may dismiss an employee for his critical speech.  <u>See, e.g.</u>, <u>Connick</u>, 461 U.S. 138 (holding that the District Attorney's interest in the efficient operation of his office outweighed assistant district attorney's interest in protected speech); <u>Garcetti</u>, 126 S. Ct. 1951 (holding that deputy district attorney did not speak as a citizen when he wrote critical memo and thus his speech was not protected by the First Amendment); <u>see also</u> <u>McVey</u>, 157 F.3d at 279 (leaving open the issue of whether the agency's interests in "effective and efficient management as well as public confidence" outweighed McVey's interest in her speech); <u>DiMeglio</u>, 45 F.3d at 806 ("A government employer, no less than a private employer, is entitled to insist upon obedience to the legitimate, day-to-day decisions of the office without fear of reprisal in the form of lawsuits from disgruntled subordinates who believe that they know better than their supervisors how to manage office affairs.").  Plaintiff has not cited a single case in which a public employee with a similar public contact role who engaged in similar conduct prevailed on a free-speech claim.

For the purpose of deciding the question of qualified immunity, <u>Connick</u> and <u>Garcetti</u>, although not factually or legally dispositive, lend support to Gilchrist's position.  <u>See</u>, <u>Clark v. Brown</u>, 861 F.2d 66, 68 (4th Cir. 1988) (holding that District Attorney was entitled to qualified immunity where he dismissed assistant district attorney for political reasons).  At the very least, they establish that dismissal of an assistant district attorney for speech which interferes with the efficient operation of the District Attorney's Office was not clearly prohibited when Gilchrist fired Smith.  <u>See</u> <u>McVey</u>, 157 F.3d at 276 ("To avoid excessive disruptions of government, a qualified immunity is recognized to protect government officials performing discretionary functions from civil damage suits 'insofar as [the officials'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting <u>Harlow</u>, 457 U.S. at 818).  Taking the facts in the light most favorable to Smith, Gilchrist is entitled to qualified immunity.

B.      North Carolina Claim

Plaintiff also alleges that his termination violated his rights under the North Carolina Constitution.  Article 1, Section 14 of the North Carolina Constitution holds:

> Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse.

N.C. Const. Art. I, § 14 (2012).  "For a public employee to assert a claim for wrongful or retaliatory discharge in violation of his right to freedom of speech under the North Carolina Constitution, the plaintiff must forecast 'that the speech complained of qualified as protected speech or activity and that such protected speech or activity was the motivating or but for cause for his discharge . . . .'"  <u>Cole v. City of Charlotte</u>, 723 S.E.2d 584 (N.C. Ct. App. 2012) (unpublished) (quoting <u>Swain v. Elfland</u>, 550 S.E. 2d 530, 533 (N.C. Ct. App. 2001)).  The Court

will again assume *arguendo* that Defendant violated Plaintiff's rights under Article 1 of the North Carolina Constitution by terminating him for conducting a news interview. However, for the reasons set forth above, the Court finds that Defendant is entitled to qualified immunity and Plaintiff's Complaint must be dismissed.

IV.     **CONCLUSION**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment, (Doc. No. 17), is **GRANTED** and Plaintiff's Complaint, (Doc. No. 1), is **DISMISSED with prejudice**. The Clerk is directed to close this case.

Signed: November 27, 2012

Robert J. Conrad, Jr.
Chief United States District Judge